NATURAL RESOURCES DEFENSE COUNCIL, INCORPORATED; Energy Research Foundation, Plaintiffs–Appellants,

v.

James WATKINS, Secretary of the Department of Energy; United States Department of Energy, Defendants–Appellees.

No. 91–2655.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 5, 1991.

Decided Jan. 23, 1992.

James Frank Simon, Natural Resources Defense Council, Inc., New York City, argued, for plaintiffs-appellants (Dan W. Reicher, Nancy S. Marks, Katherine Kennedy, Natural Resources Defense Council, Inc., New York City, on brief, for plaintiff-appellant NRDC) and (James S. Chandler, Jr., South Carolina Environmental Law Project, Pawleys Island, S.C., on brief, for plaintiff-appellant Energy Research Foundation).

Ronald Mark Spritzer, Environment & Natural Resources Division, U.S. Dept. of Justice, Washington, D.C., argued (Barry M. Hartman, Acting Asst. Atty. Gen., Scott A. Schachter, Environment & Natural Resources Div., U.S. Dept. of Justice; Robin Henderson, Office of Gen. Counsel, U.S. Dept. of Energy, Washington, D.C.; and Nicks Williams, Office of Chief Counsel, U.S. Dept. of Energy, Aiken, S.C., on brief), for defendants-appellees.

Before ERVIN, Chief Judge, and PHILLIPS and SPROUSE, Circuit Judges.

## OPINION

ERVIN, Chief Judge:

The Natural Resources Defense Council, Inc. and the Energy Research Foundation request an injunction and summary declaratory relief to block the Department of Energy's proposed reopening of a nuclear reactor at the Savannah River Site in South Carolina on the grounds that the operation of the reactor would be in violation of the Clean Water Act. The district court entered summary judgment against the plaintiffs on the issue of standing. We reverse the district court's imposition of summary judgment and remand the case for a factual hearing on the question of plaintiffs' standing. We affirm the district court's refusal to issue a preliminary injunction against operation of the reactor while this matter is pending.

## I.

The K reactor at the Savannah River Site ("SRS") is a nuclear reactor that has been used by the Department of Energy ("DOE") since 1954 to produce tritium and plutonium for nuclear weapons. The K reactor and two other nuclear reactors at the SRS, the L and P reactors, are currently the nation's only source of tritium. Tritium, an essential component of nuclear fusion or "hydrogen" bombs, gradually decays over time, and thus must be periodi-

cally replenished in the weapons in which it is used.[1]

The K, L, and P reactors have been closed since April 1988 for maintenance and safety upgrades. In February 1991, DOE issued a formal decision announcing its plan to restart the K reactor in the Third Quarter of 1991. The restart date has been postponed several times, and current plans are to restart the reactor within the Fourth Quarter of 1991.

The K reactor is cooled by drawing water from the Savannah River, circulating it once through the reactor cooling system, and then discharging the water into Indian Grave Branch, a tributary of the Savannah River that eventually rejoins the river through Steel Creek, approximately six miles from the point of discharge. Pursuant to the Clean Water Act, 33 U.S.C. § 1311, DOE has a National Pollutant Discharge Elimination System ("NPDES") permit for the K reactor's cooling water discharge. DOE does not deny that the K reactor consistently violated the thermal limits of its NPDES permit from January 1, 1984 until it was shut down in April 1988, causing substantial environmental damage to approximately 670 acres of wetlands on SRS property.[2] Further, DOE concedes that, if the K reactor is allowed to reopen as scheduled, the resulting effluent will still not meet the standards of the NPDES permit.

DOE is presently constructing a cooling tower that will allow the K reactor to meet the requirements of the NPDES permit.[3]

DOE represents that the tower will be completed no later than December 1992, and possibly earlier. Once construction of the tower is completed, the operation of the reactor must be temporarily suspended to allow the cooling system of the reactor to be tied in to the cooling tower. DOE represented to the trial court that this also would be accomplished by December 1992. DOE has pledged not to run the K reactor at over 50% of full power until the cooling tower is completed, but admits that even under this proviso, the effluent will not fall within the NPDES permit's thermal limitations.

Plaintiffs, the National Resources Defense Council, Inc. and the Energy Research Foundation (collectively, hereinafter, "NRDC"), contend that operation of the K reactor without the cooling tower would cause irreparable damage to the ecological system of the Savannah River. Specifically, NRDC claims that restarting the reactor would destroy the modest recovery that has been made in the 670 acres of wetlands that were previously damaged by the operation of the reactor. Also, NRDC contends that damage will spread to adjoining areas of the wetlands at the rate of up to 10–12 acres per year. Finally, NRDC claims that operation of the reactor will render up to 3000 additional acres of wetlands inhospitable as a habitat for various species of wildlife indigenous to the wetlands.[4]

NRDC brought a citizen suit under the Clean Water Act, 33 U.S.C. § 1365(a), in

---

1. Tritium has a half-life of approximately 12.26 years, resulting in an annual loss of approximately 5.5% of a given quantity.

2. Violation of the K reactor's NPDES permit began on January 1, 1984, when the South Carolina Department of Health and Environmental Control ("DHEC"), renewing DOE's NPDES permit, altered the terms of the permit to measure water quality at the point of discharge from the K reactor cooling system, rather than at the point where the discharged water crossed the SRS boundary. Realizing that the K reactor could not be brought into immediate compliance with the terms of the new NPDES permit, DHEC entered into a Consent Order with DOE, setting less stringent interim thermal limitations in return for DOE's commitment to undertake certain environmental impact studies and ameli-

orative measures pursuant to a specified timetable.

3. Construction of the cooling tower is mandated by Amendment #2 to the Consent Order between DOE and DHEC, dated August 31, 1987. The terms of the amendment require completion of the cooling tower by December 31, 1992.

4. NRDC derives these figures from environmental impact statements prepared by the DOE at various points in the decision-making process. The numbers were calculated based on full power operation of the K reactor. Because the DOE has committed to operate the reactor at no more than 50% of capacity, it argues that the resulting damage will be quantitatively lower than the initial forecast, but it admits that each type of damage will occur to some degree.

the United States District Court for the District of South Carolina on June 11, 1990, to block DOE's reopening of the K reactor before completion of the cooling tower.[5] On June 27, 1991, NRDC filed a motion for declaratory judgment, preliminary injunction, and partial summary judgment. On July 10, 1991, DOE filed a motion for summary judgment on the issue of standing. On August 14, 1991, the district court issued an order concluding that NRDC lacked standing. Noting the probability of appeal, the district court also addressed the preliminary injunction and declaratory relief questions on the merits and declined to issue either form of relief. NRDC appeals on each of these issues.

## II.

■ An association, such as either of the plaintiffs in this case, may have standing to sue in federal courts based either on an injury to the organization in its own right, or as the representative of its members who have been harmed. *Maryland Highways Contractors Ass'n, Inc. v. Maryland,* 933 F.2d 1246, 1250 (4th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991). In the instant case, there is no allegation that either the Natural Resources Defense Council or the Energy Research Foundation has been harmed in its own capacity; instead, the groups contend that they have representational standing.

■ An organization has representational standing when: 1) its own members would have standing to sue in their own

rights; 2) the interests the organization seeks to protect are germane to the organization's purpose; and 3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). In this case, the parties contest the first prong of this definition, whether members of the plaintiff organizations would have an individual right to sue under the Clean Water Act with regard to the discharge of the K reactor.

The requirements for individual standing were laid out by the Supreme Court in *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). In that case, the Court stated:

[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," ... and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision...."

*Id.* (citations omitted). In this case, the organizations assert their standing based on affidavits provided by three individual members of the Natural Resources Defense Council.[6]

The trial court entered summary judgment against NRDC on the issue of standing on two grounds. First, the trial court ruled that the members' affidavits did not

---

5. The record is not clear with regard to whether the K reactor could be operated at a sufficiently reduced level to comply with the NPDES permit. The Natural Resources Defense Council provides the affidavit of one of its senior staff scientists that estimates that the K reactor could be operated at approximately 4–5% of full power capacity while remaining within the limitations of the NPDES permit. The estimate, however, is based solely on extrapolation from the DOE data on full capacity operation, not on empirical testing. DOE offers no estimate on the level of operation that could be attained consistent with the NPDES permit limitations, but did state at oral argument that whatever that level would be, it would not be sufficient to allow production of adequate levels of tritium

to determine, as the DOE asserts it must, whether the K reactor can eventually be relied upon as a tritium production facility.

6. Neither the parties nor the district court differentiated between the plaintiffs on the issue of standing. We note, however, that the only affidavits alleged to confer representational standing are those provided by members of the Natural Resources Defense Council. We will not rule on the issue because it was not argued before us, but we do mention, for the benefit of the district court, that on the record before us, summary judgment against the Energy Research Foundation would seem appropriate.

allege with sufficient specificity that the affiants utilized portions of the Savannah River which were affected by the K reactor discharge. Second, the trial court held that any environmental damage resulting from the K reactor discharge would be confined to the property limits of the SRS, from which members of the general public were restricted access, and therefore could not confer standing for a citizens' suit brought by *any* member of the public.

### A.

The trial court's first assertion is wrong. The Annis and Mareska affidavits (which are substantially the same) allege:

> My avocations have long included boating, fishing, and scuba diving. Since 1982 [Mareska affidavit says 1962] I have enjoyed boating daily on the Savannah River both upstream and downstream of the Savannah River Site. As part of our boating excursions, my friends and I used to enjoy picknicking on the sandbars right by the plant and swimming in the River near the plant. For many years I used to fish and scuba dive extensively in the Savannah River both upstream and downstream of the Savannah River Site.... In the past three years, I have continued to boat, swim, and fish in the Savannah river, but not downstream from the new Savannah Bluff Lock and Dam.... The reason that I have stopped these activities is because of the effects of pollution.... I noticed that, although there is an abundance of aquatic plant life upstream from the Site, the River downstream from the Site appears comparatively barren and sterile.

Similarly, the Blumfield affidavit alleges:

> For approximately fifteen years, I frequently went boating on the Savannah River, sometimes near the Site, and I have gone boating as far east as Savannah, Georgia. When boating, I have noticed that the Savannah River downstream of the Savannah River Site has an unpleasant color and smell, which is different from the color and smell of the River upstream of the Site. As a result

of the pollution on the River, I have not gone boating on the Savannah River for about five years. I would like to go swimming in the River but do not do so because of the pollution. If the Savannah River were cleaned up, I would resume my recreational activities on the River.

The district court ruled that the affiants had not identified the exact locale of their usage as required by the Supreme Court in *Lujan v. National Wildlife Fed'n,* —— U.S. ——, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In addition, the court reasoned that because, as stated in the affidavits themselves, no affiant had used the river for recreation downstream from the SRS in three years, despite the fact that the K reactor had been shut down for those three years, the restart of the reactor "would not have any material impact upon their decision not to use the River in the areas along and downstream from SRS."

The trial court's reliance on *Lujan* is misplaced. In *Lujan,* the Supreme Court held that an affidavit that alleged general use by an affiant of an area comprising approximately two million acres of land, when only 4500 acres within that territory were the subject of the lawsuit, was insufficiently specific to establish standing. *Lujan,* 110 S.Ct. at 3188. In this case, by contrast, the affiants specifically identified the portion of the river they utilized with reference to the SRS. Here, unlike *Lujan,* the court is not required to assume any particularized geographical usage by the affiants to establish the injury necessary to confer standing.

Furthermore, the trial court's implicit "but for" test, which would not confer standing unless the affiants had shown that they had resumed their activities while the K reactor was shut down, was inappropriate. In the first place, the court assumed that any effects caused by the K reactor discharge would immediately disappear, making the area instantly suitable for recreation. However, the evidence is uncontroverted that some effects of the thermal pollution caused by the K reactor will take decades to reverse. The fact that the

affiants did not return to the vicinity of the SRS immediately upon the shutdown of the K reactor does not mean that their decision to avoid the area was not caused, at least in part, by environmental damage inflicted by the K reactor.

■ More fundamentally, the "but-for" standard employed by the district court is inappropriately stringent for determining standing under the Clean Water Act. To establish standing to redress an environmental injury, plaintiffs need not show that a particular defendant is the only cause of their injury, and that, therefore, absent the defendant's activities, the plaintiffs would enjoy undisturbed use of a resource. *See Public Interest Research Group, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 72 (3d Cir.1990), *cert. denied*, ── U.S. ──, 112 L.Ed.2d 1100 (1991).[7] Instead, to meet the "fairly traceable" requirement of *Valley Forge*, plaintiffs must merely show that a defendant discharges a pollutant that "causes or contributes to the kinds of injuries alleged by the plaintiffs." *Id.* at 72. From the record in this case, it seems highly probable that polluters other than the DOE substantially contribute to the current polluted state of the Savannah River. This fact, while it may explain why the affiants have not returned to their recreational pursuits on the lower Savannah River, does not deprive the affiants (and, derivatively, NRDC) of standing to sue DOE if it can be shown that the K reactor discharge *contributes* to the pollution that interferes with the affiants' use of the Savannah River. Consequently, we reverse the district court and hold that, if harmful pollution from the K reactor discharge can be shown in publicly accessible portions of the Savannah River basin, then the members' affidavits are sufficient to establish standing for NRDC.

### B.

■ This leads to the trial court's second ground for entering summary judgment against NRDC on the standing issue—that the environmental harm caused by the K reactor discharge is confined to the property of the SRS, from which the public is restricted access. If this is true, then the NRDC's affiants would not be able to meet the "fairly traceable" requirement for standing under *Valley Forge.*

The record is clear that at the point that the K reactor effluent ultimately leaves the property of the SRS and reenters the publicly accessible Savannah River, water temperature is within the limits of the NPDES permit. Thus, there are no direct thermal effects on the Savannah River as a result of the K reactor discharge. NRDC, however, argues that destruction of the wetlands on the SRS property would have adverse indirect effects on the river, and thus, on the interests of its members. Specifically, NRDC contends, *inter alia*, that damage to the wetlands would impact spawning and refuge of several types of commercially and recreationally important fish, with derivative consequences up and down the food chain. Additionally, NRDC argues that the wetlands would cease their important processes of nutrient recycling and organic matter decomposition, with important long-term consequences on the entire river basin.

The district court rejected this argument, characterizing NRDC's arguments as "speculative" and ruling that "none of the plaintiffs' affidavits set out specific facts creating a material dispute over thermal impact on wetlands or on the Savannah River and its tributaries." Slip Op. at 11–12. We disagree. Contrary to the district court's assertion, we believe that NRDC's affidavits are sufficient to create a material issue of fact regarding the potential for cognizable harm to the Savannah River. NRDC presented the affidavit of Dr. Daniel Childers, an assistant research profes-

---

7. We agree with the Third Circuit's holding in *Powell Duffryn* that in the context of standing: "The requirement that plaintiff's injuries be 'fairly traceable' to the defendant's conduct does not mean that plaintiffs must show to a scientific certainty that defendant's effluent, and defendant's effluent alone caused the precise harm suffered by the plaintiffs. . . . The 'fairly traceable' requirement of the *Valley Forge* test is not equivalent to a requirement of tort causation."
913 F.2d at 72 (footnote omitted).

sor of marine biology, stating that renewed operation of the K reactor would have certain specific consequences outside the boundary of the SRS. Most significantly, Dr. Childers asserts that "[t]he combination of entrainment losses and reduction in wetland nursery habitat will almost certainly result in lowered numbers of fish in the Savannah River. Impacts of this kind on wetlands adjacent to the river would necessarily result in impacts on the river itself." While DOE attacks this affidavit as conclusory, because Dr. Childers has not personally visited the SRS, Dr. Childers' conclusions are based on environmental impact studies conducted and published at the behest of DOE.

The conclusions of Dr. Childers are contradicted by several sources in the record, including: 1) the affidavit of Deborah Moore–Shedrow, Manager of the Environmental Sciences Section of the laboratory operated by DOE's contractor at the SRS, stating that prior studies had detected "[n]o differences ... in the biological communities [in the Savannah River] attributable to SRS operations;" 2) the DOE's Final Environmental Impact Statement, finding that "no impact should occur to fish populations in the Savannah River;" and 3) the Congressional testimony of Dr. Ruth Patrick, from the Academy of Natural Sciences, who testified before the Senate Armed Services Committee in 1983 that the Savannah River had suffered no adverse consequences from the operation of the SRS.

The district court erred by accepting the conclusions of DOE's experts over the conclusions offered in the affidavit of Dr. Childers. While it is entirely possible that DOE's position is correct, the potential for damage to the Savannah River outside the boundaries of the SRS is an issue of fact. Disposition by summary judgment was, therefore, inappropriate. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). NRDC must be given the opportunity to present evidence on this issue in a forum that will enable the finder of fact to evaluate the credibility of the testimony and the relative weight that should

be accorded to the conflicting scientific conclusions. Accordingly, we reverse the district court's grant of summary judgment to DOE on the question of standing and remand the case for a factual hearing on this issue.

### III.

As mentioned above, despite dismissing the case for lack of standing, the district court noted "the great likelihood that the court's ruling on standing will be appealed" and addressed the questions of issuing preliminary injunctive or summary declaratory relief. Slip Op. at 12. The court concluded that neither form of relief was warranted, and NRDC has appealed.

■ We consider first the denial of a preliminary injunction. In assessing whether preliminary injunctive relief is appropriate in a particular case, a court will consider four factors: 1) the likelihood of irreparable harm to the movant if the preliminary injunction is denied, 2) the likelihood of irreparable harm to the non-movant if the requested relief is granted, 3) the likelihood that the movant will succeed on the merits, and 4) the public interest. *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193 (4th Cir.1977). If the "balance of the harms," as measured by the first two factors, decidedly favors the plaintiff, then a court should grant a preliminary injunction if the plaintiff raises "grave" issues for resolution. *Id.* In reviewing the district court's determination, this court will reverse only for an abuse of discretion. *Rum Creek Coal Sales Inc. v. Caperton*, 926 F.2d 353, 358 (4th Cir.1991). In this case, while we believe that the district court substantially overstated the harm that would accrue to DOE by imposition of a preliminary injunction, we cannot find that the court's determination not to issue the preliminary injunction constituted an abuse of discretion.

We believe that it is clear from the record that DOE would suffer negligible harm from the issuance of a preliminary injunction. By its own admission, DOE possesses adequate tritium reserves for

current use needs; instead, DOE's asserted rationale for restarting the K reactor is to establish a five year reserve of tritium, pursuant to the requirements of the 1991 National Weapons Stockpile Memorandum ("NWSM").[8] While DOE argues that the stockpile itself is a critical element of national security policy, a better interpretation of the stockpile strategy seems to be that the stockpile is intended to be utilized when production is, for some reason, interrupted. Thus, rather than disrupting compliance with the NWSM, a preliminary injunction in this case, issued for environmental reasons, is precisely the type of circumstance that the NWSM envisioned and for which the stockpile was established. This interpretation was implicitly incorporated in the GAO Report, "Decreasing Tritium Requirements and Their Effect on DOE Programs," p. 6 (The excess tritium supply over demand means "additional time is available to evaluate ... outstanding safety and environmental issues before restarting the Savannah River reactors.").

■ Even if DOE could show that an injunction blocking the reopening of the K reactor would seriously compromise national security interests, the Clean Water Act itself allows for a Presidential override. 33 U.S.C. § 1323(a). Under the statute, the President may exempt the K reactor from NPDES requirements if the President finds that "paramount" national security interests are at stake. Given the fact that the Executive Branch possesses ultimate unilateral authority to prevent any compromise to national security concerns, it is difficult to see how DOE could suffer any harm by the imposition of a preliminary injunction.

Citing the case of *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), DOE argues that Presidential override would be unavailable in the present case. *Romero–Barcelo* concerned the discharge of ordnance by the Navy into the waters surrounding a Puerto Rican island as a consequence of a Navy weapons training program. The Supreme Court upheld a district court ruling requiring the Navy to apply for a NPDES permit, but declining to enjoin the Navy's operations in the interim. The plaintiffs in that case had argued that the courts lacked authority to decline imposition of injunctive relief in the face of a clear violation of the Clean Water Act. According to the *Romero–Barcelo* plaintiffs, the Presidential override provision signaled a Congressional intent to permit non-compliance with the law only when "paramount" interests were threatened and only when the President so determined. Allowing the courts to exercise equitable discretion, the plaintiffs argued, would eliminate the role of the Presidential exemption.

Rejecting this argument, the Supreme Court held that the Presidential override provision and the equitable discretion of the courts served differing, complementary purposes. According to the Court, equitable discretion allowed the courts to fashion "relief that will achieve *compliance* with the Act," while the Presidential override would permit "noncompliance by federal agencies in extraordinary circumstances." *Id.* at 318, 102 S.Ct. at 1806. The Court used as evidence the Executive

---

**8.** The affidavit of James Watkins, Secretary of Energy, states, "While, hypothetically, the existing tritium inventory could be depleted and used toward satisfying immediate, non-reserve tritium requirements, the 1991 NWSM requires DOE to develop a reserve tritium inventory." *See also* GAO Report, "Decreasing Tritium Requirements and Their Effect on DOE Programs," pp. 1–2 ("without starting any reactors, sufficient tritium supplies will exist to meet the anticipated needs of the nuclear weapons stockpile for the next several years"). The argument that current tritium reserves are sufficient for the foreseeable needs of the next several years becomes even stronger in light of the Supplemental Affidavits provided by the parties. As a result of the President's recent nuclear disarmament initiative, tritium demand will decline to an even greater extent than that predicted by the GAO Study. Furthermore, retirement of nuclear weapons may actually increase tritium supply by allowing tritium to be recycled from the retired weapons. As DOE concedes in the Supplemental Affidavit of Steven D. Richardson, Deputy Assistant Secretary of Energy, assuming successful resolution of logistical uncertainties, "DOE expects to be able to meet shortterm tritium requirements without immediate tritium production."

Order implementing the exemption authority, Exec. Order No. 12,088, 43 Fed.Reg. 47,707 (1978), which requires that the agency requesting Presidential exemption certify that it cannot meet the applicable pollution standards.

Seizing on this passage, DOE argues that Presidential exemption would not be available in this case because compliance is feasible and, in fact, is currently being undertaken by construction of the cooling tower. However, we do not read *Romero–Barcelo* to stand for the proposition that impossibility of compliance is a prerequisite to the availability of a Presidential exemption. Instead, we believe the Court in *Romero–Barcelo* was merely illustrating the continuing vitality of the Presidential override, by noting that the override could completely isolate a non-complying federal facility from the purview of the courts. Nothing in that opinion, or in the statutory language it interprets, suggests that the President could not exempt a federal facility that was fully capable, but unwilling, to comply with the limitations of the Clean Water Act.

Even if we were to accept DOE's argument that impossibility of compliance is necessary for a Presidential exemption, we believe that the exemption would still be available in the present context. In *Romero–Barcelo* the district court found that the Navy's operations did not cause any "appreciable harm" to the environment. Thus, the Navy could attain compliance with the Clean Water Act merely by applying for and obtaining a NPDES permit. No cognizable environmental damage would occur in the interim. In the present case, although compliance will eventually be achieved, purportedly by December 1992, substantial environmental damage may occur prior to that time. Thus, from start-up of the reactor until completion of the cooling tower, the period of time for which NRDC seeks an injunction, compliance is indeed impossible.

For the foregoing reasons, we believe that Presidential override is a viable alternative in this case. As a result, we find that there is little likelihood of the harm to

national security interests that DOE contends would follow from the issuance of a preliminary injunction.

Nevertheless, it is the plaintiffs who bear the burden of proof in showing that the "balance of harms" favors imposition of injunctive relief. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Thus, in this case, the plaintiff organizations must show a substantial likelihood of environmental damage outside the boundaries of the SRS to warrant issuance of the preliminary injunction. This they have failed to do.

As shown above, NRDC relies exclusively on the Childers affidavit to prove consequences to the Savannah River basin outside the boundaries of the SRS. While we have found this affidavit to be sufficient to raise a material issue of fact regarding NRDC's standing to litigate this matter, the affidavit, standing alone, is far from sufficient to prove the existence of irreparable environmental damage outside the SRS enclave, particularly in light of the contrary evidence adduced by the DOE. Accordingly, we do not find that the "balance of harms" favors imposition of a preliminary injunction.

Next, under *Blackwelder* analysis we turn to NRDC's likelihood of success on the merits. Here, again, NRDC faces the crucial preliminary task of establishing proper standing. Unless the plaintiffs can prove damage outside the SRS, they will not succeed on the merits. Having failed at this stage of the proceedings to prove such harm, NRDC cannot, at this time, claim a likelihood of success on the merits.

Finally, we consider the public interest. We agree with the district court's observation that "[t]he singular aspect of this case is that the parties' sharply differing views of the public interest are exactly what gave rise to the case." Slip Op. at 18. In fact, both parties assert important public policy concerns—environmental preservation by NRDC and national security by DOE. In the face of a conflict between such fundamental interests, determination of which concern is more central to the

public interest is not an appropriate function for this court.

We do find persuasive NRDC's argument that Congress has legislatively resolved the conflict between these interests by explicitly making federal facilities, including those related to national security, subject to the provisions of the Clean Water Act unless exempted by a specific Presidential order. 33 U.S.C. § 1323(a). However, until NRDC can show the relevancy of the Clean Water Act to this case, by establishing their standing to pursue a claim under that statute, they cannot avail themselves of this argument. Accordingly, we find that the public interest does not sufficiently favor either side to affect our analysis on whether a preliminary injunction should issue.

Because, on the record before us, NRDC is unable to prove a likelihood of environmental injury outside the boundaries of the SRS, we do not believe that imposition of a preliminary injunction is justified at this time. We affirm this aspect of the district court's order.

### IV.

 Finally, we decline to rule upon the issue of declaratory judgment. There must be a "case or controversy" within the meaning of Article III for declaratory relief to issue. *Alabama State Fed'n of Labor v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945); *White v. National Union Fire Ins. Co.*, 913 F.2d 165, 167 (4th Cir.1990). A "case or controversy" requires that the "plaintiff must have standing." *Mobil Oil Corp. v. Attorney General of Virginia*, 940 F.2d 73, 75 (4th Cir.1991).

In this case, while we have held that summary judgment against NRDC on the issue of standing was error, NRDC must still affirmatively establish that it does have standing. Until it can make that showing, no case or controversy exists, and neither this court nor the trial court can resolve the issue of the appropriateness of declaratory relief.

### V.

In sum, we reverse the trial court's imposition of summary judgment against the plaintiffs. We remand the case to the district court for a factual hearing on the standing issue and, if appropriate, a trial on the merits. We affirm the district court's denial of a preliminary injunction. We do not, at this time, address the issue of declaratory relief.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.