HCI TECHNOLOGIES, INC., Plaintiff,

v.

AVAYA, INC., & Catalyst Telecom, Inc., Defendants.

No. 1:06CV778.

United States District Court, E.D. Virginia. Alexandria Division.

July 13, 2006.

Brandon Hall Elledge, Holland & Knight LLP, McLean, VA, for Plaintiff.

Rodney F. Page, Bryan Cave LLP, Washington, DC, for Defendant.

## *ORDER*

ELLIS, District Judge.

The matter comes before the Court on the motion of plaintiff HCI Technologies, Inc. ("HCI"), pursuant to Rule 65, Fed. R.Civ.P., for a temporary restraining order or, in the alternative, a preliminary injunction enjoining defendant Avaya Inc. ("Avaya") from taking any steps to terminate its Master Reseller Agreement with HCI. Specifically, HCI seeks to enjoin both Ava-

ya and its authorized distributor, Catalyst Telecom, Inc., from denying HCI the benefits of the Avaya Business Partner program, including access to equipment, parts, software, passwords, and log-in codes, pending a full hearing on the merits. In its complaint, HCI asserts three federal claims, two antitrust claims alleging violations of § 1 and § 2 of the Sherman Act, respectively, and a claim for discrimination in contracting on the basis of race in violation of 42 U.S.C. § 1981. HCI also asserts six pendent state claims alleging various violations of Virginia law. More specifically, HCI alleges that Avaya's termination of the Master Reseller Agreement (i) violated the Virginia Equipment Dealers Protection Act, codified as Va. Code § 59.1–352.1, *et seq.;* (ii) constituted tortious interference with HCI's relationship with Verizon and other teaming partners, including AT & T, General Dynamics, and SAIC;[1] (iii) breached the Master Reseller Agreement with HCI; (iv) was the result of a conspiracy with Catalyst and others to injure HCI; and (v) should be enjoined on promissory estoppel grounds because HCI made substantial changes to its business which required significant investment based on Avaya's previous approval of its HCI's teaming arrangement with Verizon, AT & T, and others. The question presented, then, is whether HCI is entitled to the emergency or preliminary injunctive relief it seeks on the basis of any or all of these claims.

It is well-settled that irreparable harm and inadequacy of legal remedies form the basis for injunctive relief in the federal courts. *See Sampson v. Murray,* 415 U.S. 61, 88, 94, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). A preliminary injunction is appropriate where the court is satisfied that there is a probable right and a probable danger, and that the right may

be defeated, unless the injunction is issued, and considerable weight is given to the need of protection to the plaintiff as contrasted with the probable injury to the defendant. *See Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.,* 550 F.2d 189, 193 (4th Cir.1977). To prevail, the movant—here, HCI—must demonstrate that consideration of the following familiar factors justify preliminary injunctive relief: (i) the likelihood of irreparable harm to the movant if the preliminary injunction is denied; (ii) the likelihood of irreparable harm to the non-moving party if the preliminary injunction is granted; (iii) the likelihood that the movant will succeed on the merits; and (iv) the public interest. *See Natural Resources Defense Council, Inc. v. Watkins,* 954 F.2d 974 (4th Cir. 1992). In applying these factors, the Fourth Circuit follows the "balance-of-hardships" test. *See Natural Resources Defense Council,* 954 F.2d at 981; *Blackwelder,* 550 F.2d at 196. Under this test, a court must first consider (i) the probable irreparable injury to plaintiff in the absence of preliminary injunctive relief and (ii) the likely harm to defendant with preliminary injunctive relief. *See Blackwelder,* 550 F.2d at 196. If the balance of these two factors is decidedly in favor of plaintiff, "it is enough that grave or serious questions [on the merits] are presented; and plaintiff need not show a likelihood of success." *Id.* at 196. In essence, plaintiff's likelihood of success on the merits, as a factor in the analytical calculus, increases in significance as the probability of irreparable harm to plaintiff diminishes. *See Blackwelder,* 550 F.2d at 195. And in every case, the public interest must be considered. *Id.* at 196.

The threshold inquiry must focus on HCI's claim of immediate irreparable

---

1. HCI asserts two tortious interference claims.

harm.[2] This claim, on the current record, is unpersuasive. As an initial matter, even without "Avaya Business Partner" status, HCI will remain free not only to sell and service Avaya products (albeit perhaps not on as favorable of terms as it enjoyed as an Avaya Business Partner), but also to sell and service hardware and equipment from other manufacturers besides Avaya. Given these strategic alternatives available to HCI, it is not apparent why Avaya's termination of the Master Reseller Agreement threatens irreparable harm to HCI.

■ Quite apart from HCI's ability to mitigate its losses, it appears that any losses it might suffer would not be irreparable. This is so because a finding of irreparable harm is most appropriate where the plaintiff's damages are difficult to calculate. See Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546 (4th Cir.1994) (one factor relevant to irreparable harm issue is whether damages are susceptible to calculation). Here, the record suggests that HCI's losses attributable to the termination of the Master Reseller Agreement can be quantified with precision. Indeed, HCI has essentially done so by quantifying in its pleadings the revenues that it contends it will lose if the termination proceeds. Nor is it persuasive to argue, as HCI does, that the termination will drive it out of business, given the numerous other options HCI has with respect to reselling and servicing PBX equipment manufactured by Avaya and others. In any event, even were HCI to be driven out of busi-

ness by the termination of the Master Reseller Agreement, it does not necessarily follow that this would constitute irreparable harm. See DFW Metro Line Services v. Southwestern Bell Telephone Co., 901 F.2d 1267, 1269 (5th Cir.1990) ("The district court correctly observed that, because any potential injury suffered by DFW (including its going out of business) could be calculated and recompensed in the form of damages, DFW did not prove a likelihood of irreparable injury."). While other courts certainly have exercised their discretion to come to an opposite conclusion in this regard,[3] the circumstances of this case do not compel the conclusion that HCI would suffer irreparable harm if an injunction is not granted. For all of these reasons, plaintiff's claim for injunctive relief on the basis of its claims fail for lack of irreparable harm.

As regards plaintiff antitrust claims, a brief overview of Avaya's business and competitive position in the relevant markets is essential to evaluate HCI's likelihood of success on the merits. Avaya manufactures and sells telecommunications hardware, software, applications, and equipment, including a line of "private branch exchanges" ("PBX") and a line of IP telephony, commonly known as "Voice over IP." As with any manufacturer, Avaya has 100% market share of its own hardware, software, equipment, passwords, and log-in codes. HCI seizes on this commonplace fact to argue that HCI has unlawfully leveraged its monopoly power over its products to bolster its competitive position

---

**2.** In the context of a motion for a preliminary injunction on the basis of antitrust claims, some courts have considered whether injunctive relief is necessary to prevent immediate irreparable harm *to competition. See, e.g., U.S. v. BNS, Inc.,* 858 F.2d 456, 463 (9th Cir.1988). Because a focus on competition rather than the party seeking the injunction tends to blur the distinction between the "ir-

reparable harm" factor and the "likelihood of success on the merits" factor, irreparable harm analysis here focuses on the putative harm to HCI.

**3.** *See, e.g., John B. Hull, Inc. v. Waterbury Petroleum,* 588 F.2d 24 (2d Cir.1978) (possibility of going out of business constitutes irreparable harm).

in a separate market, the market for servicing Avaya equipment.

■ This argument fails as a matter of law, as it is based on an incorrect definition of the relevant market. To establish a *per se* tying claim under § 1, a plaintiff must prove (i) the existence of two separate products; (ii) an agreement conditioning purchase of the tying product upon purchase of the tied product (or at least upon an agreement not to purchase the tied product from another party); (iii) the seller's possession of sufficient economic power in the tying product market to restrain competition in the tied product market, and (iv) a not insubstantial impact on interstate commerce. *Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680, 683 (4th Cir.1992).

■ There is ample evidence in the existing record that the market for PBX equipment and hardware is distinct from the market for services to maintain and repair these products. Accordingly, there is a substantial likelihood that HCI would present evidence sufficient to satisfy this element of a tying arrangement. But, HCI is unlikely to prevail on its claim that Avaya "ties" the sale of its PBX products to the service of those products outside the warranty period because there is nothing in the record to show that Avaya has market power in the tying product market. There is no merit in HCI's contention that Avaya has market power because it has 100% of the market as defined by the sales of its own products. This market is not an appropriate relevant market for the assessment of Avaya's market power in the tying product market. A more correct relevant market for the tying product would be the market for all PBX products. In this market, Avaya's market share, on the current record, is approximately 20%, hardly sufficient to establish the requisite monopoly market power. Indeed, because this modest 20% market share falls far short of a monopoly, HCI will be unlikely to show that Avaya has the requisite market power to sustain a tying claim under § 1. This same lack of market power is fatal to HCI's claim of unlawful exercise of monopoly power under § 2; accordingly, it too is unlikely to succeed on the merits. *See, e.g., M & M Med. Supplies & Serv. v. Pleasant Valley Hosp.*, 981 F.2d 160, 168 (4th Cir.1992) (claims of attempted monopolization presumptively should be rejected when putative monopolizer has less than 30% share of relevant market).

Moreover, HCI's tying claim is unlikely to succeed in light of the record evidence showing that in 2005, 76% of the maintenance services on Avaya equipment in the United States were provided by vendors, manufacturers, and Business Partners other than Avaya, which is inconsistent with HCI's suggestion that Avaya has "tied" services to the sale of Avaya equipment. For all of these reasons, plaintiff has not presented even a "serious question" on the merits, to say nothing of a likelihood of success on its antitrust claims. *See Natural Resources Defense Council*, 954 F.2d at 981 (serious question on the merits is prerequisite for preliminary injunction).

■ Plaintiff also alleges that Avaya unlawfully impaired HCI, a minority owned business, from performing its contractual obligations, in violation of 42 U.S.C. § 1981. As an initial matter, HCI has provided virtually no evidence in support of this claim. In this regard, HCI makes three allegations. First, HCI alleges that at a meeting on an unspecified date, Linda Schumacher stated that she was "uncomfortable" with HCI's minority contracting status. Second, HCI alleges that Avaya replaced HCI with another non-minority owned Business Partner as the service provider for Blue Cross/Blue Shield of Massachusetts. Finally, HCI alleges that

Avaya refused to support HCI's post-award request to provide customer support for U.S. Air Force procurement in favor of a non-minority owned Business Partner that was teaming with HCI's partner on the same procurement. For its part, Avaya denies that any action it took was motivated by illegal animus. Thus, based on the evidence in this record, HCI's chance of success is in equipoise with Avaya's with respect to this claim.[4] Put simply, the evidence in this record regarding HCI's § 1981 claim is too slender a reed to support the injunctive relief it seeks. Moreover, for the reasons stated previously, it does not appear that plaintiff would suffer irreparable harm in the absence of the injunctive relief it seeks. Accordingly, HCI's claim for injunctive relief on the basis of its § 1981 claim fails both for lack of substantial prospects for success on the merits, and for lack of irreparable harm.

■ All of HCI's state claims allege a breach of Virginia law. Given that the contract between the parties contains a choice of law provision stating that New Jersey law governs the parties disputes, none of HCI's claims based on Virginia law is likely to succeed. Quite apart from this, several of HCI's state law claims are infirm for other reasons. For instance, HCI will not likely prevail on its claim under the Virginia Equipment Dealer Protection Act because it it does not qualify as a "equipment dealer" within the meaning of the Act. *See* Va.Code § 59.1–352.2 (restricting applicability of Act to dealers and suppliers of farm equipment). And, HCI's promissory estoppel claim is unlikely to succeed since the parties' contract explicitly gives either party the right to terminate the contract with or without cause with 24 hours notice. Given this provision, HCI is unlikely to prevail on its claim that Avaya

breached any implicit promise not to terminate HCI. *Tuomala v. Regent University*, 252 Va. 368, 376, 477 S.E.2d 501 (1996) (promissory estoppel inapplicable where parties have entered into enforceable contract). Finally, and for the reasons already stated, there is no reason to believe even assuming HCI prevailed on any of its state law claims that damages could not be calculated or that damages would be insufficient to compensate HCI for losses caused by the Master Reseller Agreement termination. For all of these reasons, injunctive relief is unwarranted on the basis of any of the state law claims HCI asserts.

It is worth noting that, distilled to its essence, this is a breach of contract dispute between business entities. Their dispute stems from teaming arrangements HCI entered with Verizon and others pursuant to which HCI would be the exclusive subcontractor responsible for servicing Avaya products for which Verizon was the end user. Although the parties disagree whether Avaya sanctioned such agreements, it is undisputed that at some point, Avaya was no longer willing to tolerate HCI's participation in these teaming arrangements, as they impeded Avaya's ability to compete in the market for servicing and repair of Avaya equipment. This is not to say, of course, that HCI could not compete with Avaya (and others) for such service contracts; Verizon was and is free to hire whomever it pleases, including HCI, to perform service and repair on the Avaya equipment Verizon purchases. What HCI cannot do under the Master Reseller Agreement, however, is to enjoy the benefits attendant to status as a designated "Avaya Business Partner," and, at the same time, enter into teaming arrangements with Verizon or others that have the purpose and effect of precluding Avaya

---

**4.** The vagueness of HCI's allegations make it difficult to determine whether any or all of the events on which it would rely to support its § 1981 claim are time barred.

from competing for such service contracts. Put simply, HCI could choose either to continue as an "Avaya Business Partner," or it could pursue teaming arrangements to Avaya's detriment, but not both. Having chosen to bite the proverbial hand that fed it, HCI cannot seek an injunction preventing Avaya from exercising its contractually-defined right to terminate the parties' agreement. *See Second City Music, Inc. v. City of Chicago, Ill.,* 333 F.3d 846, 850 (7th Cir.2003) (self-inflicted wounds do not constitute irreparable injury).

For these reasons, and for the reasons stated from the bench,

It is **ORDERED** that HCI's motion for a temporary restraining order or, alternatively, a preliminary injunction is **DENIED.**

It is further **ORDERED** that the parties submit supplemental briefing on the issue of the arbitrability of plaintiff's antitrust claims according to the following schedule:

(i) Plaintiff's brief must be filed by 5:00 p.m., Friday, July 21, 2006; and

(ii) Defendant's brief must be filed by 5:00 p.m., Friday, July 28, 2006.

(iii) The matter will be decided thereafter without oral argument.

It is further **ORDERED** that in view of the arbitration clause contained in the parties' contract, all remaining claims in plaintiff's complaint are **DISMISSED.**

The Clerk is directed to send a copy of this Order only to counsel of record.

### ORDER

By Order dated July 13, 2006, the Court called for supplemental briefing regarding the arbitrability of plaintiff's antitrust claims. *See HCI Technologies, Inc. v. Avaya, et al.,* Case No. 1:06cv778, 446 F.Supp.2d 518 (July 13, 2006) (Order). In its supplemental brief, plaintiff relies almost exclusively *on American Safety Equipment Corp. v. J.P. Maguire & Co.,* 391 F.2d 821, 827–28 (2d Cir.1968), for the proposition that the antitrust claims in issue here are not arbitrable. Yet it is dubious whether this case remains good law: A review of subsequent case law reveals that while the grim reaper may not yet have found *American Safety's* address, he is certainly in the neighborhood.

In 1985, the Supreme Court granted certiorari in *Mitsubishi Motors Corporation v. Soler Chrysler–Plymouth,* to determine if Soler's antitrust claims in that case were non-arbitrable even though the parties had signed an arbitration agreement. *See* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Because the Supreme Court held that Soler's claims were arbitrable based on concerns of international comity, the Supreme Court expressly declined to address whether *American Safety* remained good law. *Id.* at 629, 105 S.Ct. 3346.

In the wake of *Mitsubishi,* however, several courts of appeal have held that *American Safety* is no longer good law, and that *Mitsubishi* stands for the proposition that all antitrust claims—including those without international implications—are arbitrable.[1] Other circuits have stated that *Mitsubishi* casts serious doubt on *American Safety's* validity.[2] Finally, both the Supreme Court and the Fourth Circuit have interpreted *Mitsubishi* to establish that

---

**1.** *See Seacoast Motors of Salisbury, Inc. v. DaimlerChrysler Motors Corp.,* 271 F.3d 6 (1st Cir.2001) (expressly rejecting *American Safety* in view of *Mitsubishi* ); *Kotam Elecs., Inc. v. JBL Consumer Prods., Inc.,* 93 F.3d 724, 725–28 (11th Cir.1996) (same); *Nghiem v. NEC*

*Elec., Inc.,* 25 F.3d 1437, 1442 (9th Cir.1994) (same).

**2.** *See Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 250 (7th Cir.

most statutory claims are arbitrable. Nor is there any doubt that Sherman Act claims are among those statutory claims that can be arbitrated: Both the Supreme Court and the Fourth Circuit have cited *Mitsubishi* for this exact proposition. *See Gilmer v. Interstate/Johnson Lane Corporation,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) ("It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA.") (citing *Mitsubishi*); *Brown v. Trans World Airlines,* 127 F.3d 337, 340 (4th Cir.1997) (stating that *Mitsubishi* holds that "Sherman Act claims are arbitrable").

██ Based on the abundance of case Supreme Court, Fourth Circuit, and other authority on point, it is clear that antitrust claims are arbitrable; therefore, plaintiff's antitrust claims must be dismissed pursuant to the parties' arbitration agreement.[3] Accordingly,

It is **ORDERED** that plaintiff's antitrust claims are **DISMISSED** pursuant to the parties' arbitration agreement.[4]

The Clerk is directed to send a copy of this Order to counsel of record, and to place the case among the ended matters.

1994), *Swensen's Ice Cream Co. v. Corsair Corp.,* 942 F.2d 1307, 1310 (8th Cir.1991).

3. As to plaintiff's counsel's supplemental brief, there is something more. While plaintiff's counsel understandably and appropriately seek to be zealous advocates for their client, they must do so within the confines of their responsibilities as officers of the Court. In view of the vast amount of authority on point—some of which is binding on this Court—rejecting *American Safety* and stating that antitrust claims are arbitrable, plaintiff's counsel's uncritical acceptance of and reliance upon *American Safety* is disappointing.

Indeed, it strains credulity to believe that their failure to cite even a single post-*Mitsubishi* case on this issue was accidental, and falls just short of sanctionable.

4. Dismissal is the appropriate remedy when all claims in a case are governed by an enforceable arbitration agreement. *See Choice Hotels International, Inc. v. BSR Tropicana Resort, Inc.,* 252 F.3d 707, 709–10 (holding that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable"); *Poteat v. Rich Products Corp.,* 91 Fed. Appx 832, 835 (4th Cir.2004) (same).