Frances Broaddus **CRUTCHFIELD** and Henry Ruffin **Broaddus, Plaintiffs,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS and the Hanover Group, L.L.C., Defendants.**

**No. CIV.A. 3:02CV594.**

United States District Court, E.D. Virginia, Richmond Division.

Oct. 31, 2002.

William B. Ellis, Esquire, Benjamin A. Thorp, III, Esquire, Ellis & Thorp, Richmond, for Plaintiffs.

M. Hannah Lauck, Esquire, United States Attorney's Office, Richmond, for Corps.

James C. Roberts, Esquire, Bradfute W. Davenport, Jr., Esquire, George A. Somerville, Esquire, Troutman Sanders, LLP, Richmond, for The Hanover Group.

## MEMORANDUM OPINION

PAYNE, District Judge.

In this action, Frances Broaddus Crutchfield and Henry Ruffin Broaddus ("Crutchfield" or the "Plaintiffs") seek an order invalidating a permit issued under the Clean Water Act, 33 U.S.C. § 1251, *et seq.* by the United States Army Corps of Engineers ("the Corps") to The Hanover Group, L.L.C. ("THG") on April 30, 2002. The permit at issue allows, with conditions, THG to build a sewer line (the "Academy Creek Trunk Sewer" or "AC Sewer") from the Bluffs at Bell Creek, a project being developed by THG in Hanover County, Virginia (the "Bell Creek Project"), to the so-called Shelton Point Pump Station ("SPPS"), a part of the existing sewage system operated by Hanover County, Virginia (the "County"). Pursuant to Fed. R.Civ.P. 12(b)(1), THG has moved to dismiss the action on the ground that the Plaintiffs lack standing and that, therefore, the Court lacks subject jurisdiction.[1] THG also has moved for summary judgment under Fed.R.Civ.P. 56 on the ground that the Plaintiffs are in laches. For the reasons set forth below, because Plaintiffs lack standing, the motion to dismiss this action is granted. The motion for summary judgment predicated on the asser-

tion that the Plaintiffs are in laches is denied as moot.

## BACKGROUND

This action is best understood if viewed in the context of two separate actions brought by the Plaintiffs against the Corps and the County. Each of those separate actions, one of which is final and one of which is pending, focuses on the legality of permits issued by the Corps for a wastewater treatment project being pursued by the County. Hence, it is appropriate to explain briefly those actions.

As originally planned, the County's wastewater treatment project consisted of several components: (1) a wastewater treatment plant (the "WWTP"); (2) a sewage interceptor pipeline (the "TC Interceptor") for collecting sewage and transporting it to the WWTP; (3) a forcemain for transporting the treated sewage from the WWTP to the Pamunkey River at a point where the river is adjacent to Newcastle Farm, an historic property that the Plaintiffs' family has owned for six generations; and (4) an outfall/diffuser, the purpose of which is to distribute the effluent from the WWTP into the Pamunkey River adjacent to Newcastle Farm. The purpose of the project is to meet the County's growing wastewater treatment needs and to reduce the County's current dependence for sewage treatment on the wastewater treatment facilities of neighboring Henrico County, with whom the County has a contract under which the County is entitled to use 5.4 million gallons per day of Henrico County's sewage treatment capacity.

Over the Plaintiffs' objections, the Corps issued so-called Nationwide permits ("NWPs") which permitted the County to

---

1. Alternatively, THG's motion asserts that the question of standing is raised under Fed. R.Civ.P. 56, but, for reasons discussed more fully below, and as conceded by THG at oral argument, Rule 56 is not the proper framework for analysis of the standing issue as it is presented here.

build the WWTP, the forcemain and the outfall/diffuser. While the Corps was considering whether the County could rely on the NWPs for those three components, it was considering separately a so-called individual permit for the TC Interceptor. For reasons set forth fully in *Crutchfield v. United States Army Corps of Engineers*, 154 F.Supp.2d 878 (E.D.Va.2001) (*"Crutchfield I"*),[2] the Corps' decision to authorize use of NWPs for three out of four segments of an integrated project and to require an individual permit application only for the fourth component (the TC Interceptor) was set aside as arbitrary, capricious and not otherwise in accordance with law. As explained fully in *Crutchfield I*, authorization to use an NWP requires a less rigorous environmental review than does the issuance of individual permits. *Id.* at 893–94.

The matter was remanded to the Corps for further consideration. Throughout the pendency of *Crutchfield I*, the County continued to construct parts of the project. Thus, by the time *Crutchfield I* was decided on August 14, 2001, the forcemain was largely completed and much work had been completed on the WWTP. No work had been done on the outfall/diffuser or on the TC Interceptor. For the reasons outlined in *Crutchfield v. United States Army Corps of Engineers*, 192 F.Supp.2d 444 (E.D.Va.2001) (the "November 2 Injunction Opinion"), the County was enjoined from further construction on the project pending reassessment by the Corps of the permitting issues on remand.[3]

Beginning in late 1998 or early 1999, THG began planning development of the multi-use Bell Creek Project located on 449 acres in Hanover County. Plans for the Bell Creek Project called for 535 residential lots, a 157 acre business park, 20 acres of retail space and a 124 acre historical park. The plans for the Bell Creek Project include the AC Sewer which runs some 9,800 feet from the northwest corner of the project's commercial property to the SPPS. Approximately 2,200 feet of the 9,800 foot long AC Sewer is to be built by THG along the sewage easement originally designated for the previously proposed TC Interceptor. The sewage easement is owned by the County. At its beginning point, the AC Sewer will be twelve inches in diameter increasing in size along its length until the diameter reaches thirty inches beginning at the 2,200 foot segment located in the easement formerly dedicated to the TC Interceptor and continuing at that diameter until the AC Sewer meets the SPPS.

Sewage from the Bell Creek Project will travel the AC Sewer to the SPPS and then to another County pumping station, the Beaverdam Pump Station, from which it will be pumped to a sewage treatment facility owned by Henrico County for treatment pursuant to the contract between Henrico County and the County. However, if the County's project receives the necessary permits from the Corps and the County's wastewater treatment project is brought into operation, sewage from the Bell Creek Project will be rerouted and sent to the WWTP for treatment and then will be discharged into the Pamunkey River adjacent to Newcastle Farm. *Crutchfield v. United States Army Corps of Engineers, et al.*, 214 F.Supp.2d 593, 633

---

**2.** Related decisions are published under the same style at 175 F.Supp.2d 835 (E.D.Va. 2001) and 192 F.Supp.2d 444 (E.D.Va.2001).

**3.** The Corps did not appeal any of the decisions in *Crutchfield I*, but the County did.

However, the County's appeal was dismissed as moot after the November 2 Injunction Opinion was vacated on June 4, 2002 as no longer necessary because the Corps issued, on April 4, 2002, a new permit for a similar but not identical project.

(E.D.Va.2002) ("*Crutchfield II*" or the "August 7 Opinion").

Pursuant to an agreement it made with the County in November 2000, THG was obliged to build the 2,200 foot segment of the sewer main to the SPPS if the TC Interceptor, for any reason, was not built by the County. In that event, THG would be entitled to oversize credits to the extent that the diameter of the AC Sewer exceeded the size sewer main that was required to service the Bell Creek Project.[4] It is undisputed that the capacity of the AC Sewer is greater than necessary to serve the Bell Creek Project and that the County will be obligated to extend oversize credits to THG in compensation for building a larger sewer.

The decision in *Crutchfield I,* particularly the November 2 Injunction Opinion, made it unlikely that the TC Interceptor, as originally proposed, would be available for connection to the AC Sewer when sewage collection and transport was expected to be needed for the Bell Creek Project. Therefore, after the November 2 Injunction Opinion, THG began to consider how it would build the 2,200 foot segment by which the AC Sewer would connect to the SPPS. Under circumstances and for reasons that are in dispute, THG met with the County and the Corps in November 2001. At about the same time, THG withdrew an application it had made to the Corps for an eight inch sewer to serve part of the Bell Creek Project. The parties dispute the motivation for, and the effect of, the decision to withdraw that application.

On November 16, 2001, the County submitted to the Corps a revised joint permit application in which it sought authorization to construct the WWTP, the forcemain and the outfall/diffuser (as those components of the project originally had been designed). However, the revised application no longer sought to use the TC Interceptor as the means through which raw sewage would be conveyed to the WWTP. Instead, the County proposed to construct as the fourth component of the project, the Lee Davis Pump Station and forcemain which would connect with the SPPS and would take sewage through the forcemain and deliver it to the WWTP for treatment. In other words, the revised project proposed to replace the TC Interceptor with the Lee Davis Pump Station and forcemain. At the same time, the County represented that it had abandoned any plans to construct the TC Interceptor in the foreseeable future, and it formally withdrew the permit application for that component of the original project.

As the Corps represented to the Court and the Plaintiffs in *Crutchfield I,* the Corps initially treated the revised permit filed by the County on November 16, 2001 as an application for an individual permit. Notwithstanding that the Corps had represented to the Court, the Plaintiffs, and the public that it would consider the application for the revised project under the individual permit regime, the Corps, soon thereafter, decided that it would likely accord the project verification under the NWP program. In fact, the Corps was all

---

4. Under the County's oversizing policy, developers like THG that require sanitary sewer service in geographic areas that do not already receive such service must construct sewage collection mains large enough not only to serve the developer's project, but also all potential future development in the surrounding drainage shed. In exchange for building larger than necessary, the developer receives "oversize credits" that can then be used to offset future costs of connecting to the system. As Stephen Herzog from the County's Department of Public Utilities explained at the October 24 Hearing, the County employs this policy in order to eliminate the impact on the environment and surrounding property owners of constructing additional sewer lines.

but committed to that course before it issued a public notice calling for comments on the County's application for an individual permit, although the Corps failed to disclose this intent to the public. Predictably, the resulting public comment did not even address the issues surrounding possible authorization under the NWPs that the Corps later issued. *Crutchfield II*, 214 F.Supp.2d at 609–18. After close of the comment period, the Corps issued permits for the revised project under several NWPs and the Plaintiffs challenged the decision. For reasons set forth fully in *Crutchfield II*, the permits for the revised project were set aside as arbitrary, capricious and otherwise not in accordance with law.

On December 13, 2001, slightly less than one month after the County filed the application for the revised project and about six weeks after the November 2 Injunction Opinion in *Crutchfield I*, THG submitted to the Corps an application for an individual permit for the Bell Creek Project including construction of the AC Sewer. On February 11, 2002, Plaintiffs' counsel commented on THG's permit application, pointing out, *inter alia*, that approximately one quarter of the length of the AC Sewer would lie in the path of the TC Interceptor, as originally proposed, and arguing that, in reality, THG was acting for the County to accomplish what the County could not do itself as a result of the November 2 Injunction Opinion in *Crutchfield I*.

The opinion in *Crutchfield II* was issued on August 7, 2002. The rationale for that decision is set forth fully in the previously cited published opinion. However, two aspects of the opinion are of significance to this action. Among the faults leading to vacation and remand of the NWPs for the revised project was the Corps' finding that the County's application for the revised project included all activities that are "reasonably related" to the same project. *See Crutchfield II*, 214 F.Supp.2d at 621–38. In sum, the Corps ignored or glossed over, significant record evidence respecting whether the permit application contained a disclosure of all activities which the applicant plans to undertake which are reasonably related to the same project and for which a Corps permit would be required. Consequently, the Corps' decision on those issues was found to be arbitrary, capricious and otherwise not in accordance with law. The matter was remanded to the Corps for further explication of its decision on all aspects of the reasonably related issues, including, but not limited to, the AC Sewer.[5]

Also, in *Crutchfield II*, the Corps was required to apply the so-called "independent utility" test as a predicate to authorizing use of the NWPs. A part of that test requires the Corps to make a reasoned conclusion whether the County and THG constituted "an association of owners/developers" within the meaning of 33 C.F.R. § 330.2(i). The Corps neither discussed nor decided that crucial aspect of the regulatory requirement, notwithstanding the existence of substantial evidence that the County and THG might be an association of owners/developers.

While *Crutchfield II* was pending, the Corps issued the permit to THG that is in issue in this case. That occurred on April 30, 2002 (11 days after the Plaintiffs had filed the complaint in *Crutchfield II*). Aware that the findings in *Crutchfield II* might provide a basis for challenging the THG permit, the Plaintiffs filed this action on August 19, 2002 and filed a First

---

5. The Corps ignored, or superficially dealt, with a number of activities as to which there was evidence of reasonable relatedness. The AC Sewer was but one of several such activities.

Amended Complaint on September 16, 2002.

The First Amended Complaint charges, in Count 1, that the application issued to THG was neither signed nor submitted by the proper party because THG and the County were an association of developers and that the County was the person who truly desired to undertake the activities for which the permit was applied. In Count 2 of the First Amended Complaint, the Plaintiffs raised a charge that the Corps did not follow certain regulations issued by the Environmental Protection Agency known as the Section 404(b)(1) Guidelines. In Count 3 of the First Amended Complaint, the Plaintiffs alleged that the Corps violated its own regulations by not including all reasonably related activities to be undertaken by the applicant. The First Amended Complaint asked the Court to invalidate and declare void the permit issued to THG to the extent that it authorizes discharges associated with the TC Interceptor into the Pamunkey River.

The theme of the First Amended Complaint is that THG is acting for, and on behalf of, the County in applying for the permit for, and in constructing, the 2,200 feet of the AC Sewer which will lie in the right-of-way of the former TC Interceptor. Plaintiffs' underlying contention is that construction of the 2,200 foot segment of the AC Sewer is but the beginning of a return by the County to its plan to construct the entire TC Interceptor, notwithstanding the County's avowed intent not to do so in the foreseeable future. The injury of which the Plaintiffs complain in the First Amended Complaint is the discharge of effluent into the Pamunkey River and the attendant consequences of the discharge in depriving the Plaintiffs of the use and enjoyment of Newcastle Farm and in degrading the water quality of the river in which they fish and boat.

## DISCUSSION

Against this background, THG's motion to dismiss for lack of standing will be considered. The analysis begins with an outline of the applicable rules for assessing standing. Then, those precepts will be considered in perspective of the facts of this case.

### A. Legal Principles Applicable To Assessing Standing

Article III of the Constitution requires that federal courts only adjudicate "cases" and "controversies." To qualify as a case or controversy, a matter must be "of the sort traditionally amenable to, and resolved by, the judicial process." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). A plaintiff's "standing to sue" is a defining characteristic of cases and controversies that are amenable to judicial resolution. The standing requirement " 'tends to assure that the legal questions presented to the court will be resolved, not in the rarefied atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." ' *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 153–54 (4th Cir. 2000) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).

To satisfy the "irreducible constitutional minimum of standing," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), a plaintiff must have suffered an injury in fact that is both " 'fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' " *Gaston Copper*, 204 F.3d at 154 (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). This formu-

lation contains three elements: (1) injury; (2) traceability, sometimes called causation; and (3) redressability. *See id.* "While each of the three prongs of standing should be analyzed distinctly, their proof often overlaps. Moreover, these requirements share a common purpose—namely, to ensure that the judiciary, and not another branch of government, is the appropriate forum in which to address a plaintiff's complaint." *See Gaston Copper,* 204 F.3d at 154 (citing *Allen,* 468 U.S. at 752, 104 S.Ct. 3315).

■ To satisfy the injury-in-fact element, the Plaintiffs must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130 (internal citations and quotation marks omitted). This requirement is designed to filter out claims of highly attenuated injuries. *See id.* Accordingly, "[f]ederal jurisdiction cannot lie if the alleged injury is merely 'an ingenious academic exercise in the conceivable.'" *Gaston Copper,* 204 F.3d at 156 (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 688, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)). Nevertheless, this rule differentiates between kinds of injuries, not between injuries of different degree. As the Fourth Circuit has noted, "[t]he claimed injury need not be great or substantial; an identifiable trifle, if actual and genuine, gives rise to standing." *Conservation Council of North Carolina v. Costanzo,* 505 F.2d 498, 501 (4th Cir.1974) (internal quotations marks omitted). In environmental cases, the Supreme Court has recognized that an actual harm to a plaintiff's "aesthetic or recreational" interests is sufficient to satisfy the injury-in-fact requirement. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). Hence,

a showing of injury to the environment is not required. Rather a cognizable injury to the plaintiff must be shown. *See id.* at 181, 120 S.Ct. 693.

■ Traceability is a matter of causation, but traceability is "not equivalent to a requirement for tort causation." *Friends for Ferrell Parkway, LLC v. Stasko,* 282 F.3d 315, 324 (4th Cir.2002) (internal quotation marks omitted). Thus, a plaintiff must show that the actual or threatened injury complained of in the case is " 'fairly ... trace[able] to the challenged action of the defendant.'" *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130 (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). That is to say, "federal plaintiffs must allege some threatened or actual injury resulting from the putatively illegal action." *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). *See generally* 15 James Wm. Moore, *et al.,* Moore's Federal Practice § 101.41 (3d ed. 2002) As the Supreme Court has explained:

> [When] [t]he existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict ... it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury.

*Defenders of Wildlife,* 504 U.S. at 562, 112 S.Ct. 2130 (internal quotations marks omitted).

■ Redressability requires a plaintiff to show that it is likely, rather than merely speculative, that a favorable decision will redress the injury. *See Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130.

Stated differently, "[t]he redressability requirement ensures that a plaintiff personally would benefit in a tangible way from the court's intervention." *Gaston Copper*, 204 F.3d at 162 (internal quotations marks omitted).[6]

The proponents of federal jurisdiction, in this case the Plaintiffs, bear the burden of proving each of the elements of the applicable standing test. *See Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. 2130.[7]

**B. The Proper Procedural Construct**

THG and the Plaintiffs agree that the standing issue is to be conducted pursuant to the three factor formulation articulated in *Defenders of Wildlife*. However, before turning to the application of that test to this action, it is necessary to dispose of a procedural matter presented by the assertion in THG's motion that dismissal is alternatively appropriate under Fed. R.Civ.P. 56, if it is not accomplished under Fed.R.Civ.P. 12(b)(1).

The evidentiary standard for motions under Rule 12(b)(1) depends on whether the challenge is a facial attack on the sufficiency of the pleadings, or an attack on the factual allegations that support jurisdiction. *See Walker v. United States Dept. of the Army*, 60 F.Supp.2d 553, 555 (E.D.Va.1999) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982)); *see also* 2 Moore's Federal Practice § 12.30[4]. In the case of a facial attack, the court must accept the plaintiff's allegations as true. However, in the case of an attack on the

facts supporting jurisdiction, the court is "free to weigh the evidence to determine the existence of jurisdiction" because its "very power to hear the case" is at issue. *Walker*, 60 F.Supp.2d at 555. Moreover, " 'no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.' " *Id.* (quoting *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). Because THG challenges the factual basis of jurisdiction through a Rule 12(b)(1) motion to dismiss, an independent evaluation of the merits of the jurisdictional claim is appropriate. Counsel for THG correctly agreed at oral argument that this, not Rule 56, is the proper procedural construct for assessing the standing challenge.

**C. The Injury Component Of The Standing Assessment**

The starting point of the standing analysis is to identify the injury which the Plaintiffs contend has been sustained by the allegedly illegal action for which they seek redress. In the First Amended Complaint, the Plaintiffs articulate that their injury is the discharge of effluent from the WWTP (through the outfall/diffuser) into the Pamunkey River. (First Amended Compl. ¶¶ 28–32.) They particularize the consequences of that injury as the loss of use and enjoyment of the Pamunkey River and their adjoining farm and the degrada-

---

**6.** The Plaintiffs here seek judicial review of the Corps' decision under the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 702. Neither party presents the standing issue as one governed by the APA. Instead, both have presented the standing issue as a constitutional one.

**7.** The quantum of evidence sufficient to satisfy this burden increases during the successive phases of litigation and is the same as that for

any other indispensable part of the plaintiff's case. *Id.* For instance, during the pleading phase, a general factual allegation may suffice, but in responding to a motion for summary judgment, the plaintiff must set forth, in the form of affidavits or other evidence, specific facts rather than relying on bare allegations. *Id.* In the merits phase, the plaintiff must support these facts (if controverted) adequately with sufficient evidence adduced at trial. *See id.*

tion of the water quality in the river.[8] In their brief on standing, the Plaintiffs assert that injury is occasioned because sewage from the Bell Creek Project will eventually be pumped to the WWTP and then discharged (after treatment) into the river. (Pl. Br. at 31, 36.)

Thus, as the Plaintiffs have framed the issue, their injury is the discharge of sewage from the Bell Creek Project into the river after it is transported to the WWTP, through the Lee Davis Pump Station and forcemain, treated at the WWTP and transported through the discharge forcemain to the outfall/diffuser and thence into the Pamunkey River. And, thereupon, the injury of loss of use and enjoyment to their farm will occur.

THG does not directly assert that the Plaintiffs fail to meet the actual or threatened injury component of the standing requirement. But, as the Plaintiffs recognize (Pl. Br. at 4–5), THG, in fact, does mount a no injury-in-fact argument by asserting that waste collected by the AC Sewer may never be conveyed to the WWTP (and thence to the river at their farm) because the Corps may not issue a permit for the revised project. And, indeed, much of THG's standing argument and supporting evidence is directed to the proposition that the Plaintiffs' asserted injury is conjectural, remote and speculative (THG Reply Br. at 6, 15–18.)

Because standing is a matter of subject matter jurisdiction and because the parties have argued, (albeit in the linguistics of traceability and sometimes even redressability), whether the injury-in-fact requisite has been met, it is appropriate for the Court to consider whether the injury component of the standing inquiry has been satisfied. As explained below, the injury component has not been met.

The discharge of effluent from the Bell Creek Project (with the attendant consequences)—the injury complained of—cannot occur at Newcastle Farm unless the Corps issues a permit or permits for the County's project on remand in *Crutchfield II*. Although the Corps has twice failed to discharge its obligations (as explained in *Crutchfield I and II*), the Court cannot presume that the Corps will once again fail to fulfill its duties. That is especially true where, as here, the Court has directed that the examination on remand be conducted in another district and the Corps has represented that the other district even now is proceeding with the remand.

On this record, the asserted threatened injury is remote, not imminent, and its occurrence is predicated on the surmise that the Corps will make a specific decision, which, of course, the Court cannot forecast.

## D. The Causation Component Of Standing

In assessing whether the Plaintiffs have satisfied the causation component of the standing test, it is necessary to recall that the gist of the Plaintiffs' case is that the 2,200 foot segment of the AC Sewer that lies in the path of the former TC Interceptor is, in fact, the first stage of the TC Interceptor. In other words, here, as in *Crutchfield II*, the Plaintiffs contend that, notwithstanding statements to the contrary, the County has not abandoned the TC Interceptor, and, in fact, the County now intends to build the TC Interceptor, albeit in the future, as part of its sewage collection system. According to the Plaintiffs, that process begins with the 2,200 foot segment of the AC Sewer at issue

---

**8.** The First Amended Complaint also alleges injurious construction related discharges. Those have been abandoned as a ground for standing. (Letter from Ellis to the Court of October 21, 2002.)

here, and the County will have other developers connect to that segment as development occurs along the route of the former TC Interceptor.

As the Plaintiffs correctly note, the Court has found, in *Crutchfield II*, that the administrative record in that case contained significant evidence that: (i) the Bell Creek Project was reasonably related to the County project, at least as to the 2,200 foot segment of the AC Sewer being built by THG; and (ii) THG and the County were an association of owners/developers. Because the Corps ignored (in some instances) and glossed over (in other instances) that evidence, those two matters are part of what the Corps is required to consider on remand in *Crutchfield II*.[9]

Relying in large measure on those findings, the Plaintiffs contend that the Corps' decision to issue the permit for the Bell Creek Project to THG is likewise fatally flawed and that THG's permit must be set aside. In response, THG offered affidavit evidence probative of whether the Bell Creek Project is "reasonably related" to the County's project and whether the County and THG are an "association of owners/developers." On the basis of that evidence, THG argues that the causation component of standing is not satisfied.[10]

However, those two issues were remanded to the Corps for decision in *Crutchfield II* along with a substantial number of other related issues. The Court cannot remove those issues from consideration by the Corps on remand in *Crutchfield II* and decide them in this case because to do so would render moot much of what has been remanded. If it were appropriate or necessary to make those findings here, the decision on standing would have to be deferred until after the Corps had made its determinations on remand.

■ Moreover, it is not necessary to reach either issue to decide the causation component of standing here. As explained below, it is clear, from the face of the First Amended Complaint, and the parts of *Crutchfield II* incorporated therein, that the injury complained of by the Plaintiffs in this case, even if cognizable as an injury-in-fact, was not caused by the putatively illegal acts of the Corps or THG at issue in this case.

The discharge of raw sewage from Bell Creek to the SPPS is the discharge permitted by the THG permit. (Administrative Record at 885.) The injury complained of is the discharge of treated sewage from the WWTP into the Pamunkey River. That will occur only if the Corps issues permits for the WWTP, the

---

9. However, these two issues certainly are not the only ones that the Corps must consider on remand. For example, on remand, the Corps must make the reasonably related determination required by 33 C.F.R. § 325.1(d)(2) in perspective of a number of other parts of the County's sewage collection and treatment plans that were in the record but were either ignored or superficially addressed by the Corps. *See, e.g., Crutchfield II,* 214 F.Supp.2d at 628–38. Furthermore, should the Corps decide to evaluate the project for authorization under multiple NWPs pursuant to 33 C.F.R. § 330.6(c), it likewise must assess whether the previously ignored parts of the County's plans are part of the "single and complete project" as defined by 33 C.F.R.

§ 330.2(i) and 67 Fed.Reg.2020, 2094. *See e.g., id.* at 646–52.

10. At a hearing held on October 24, and 25, 2002, THG presented additional evidence on those issues as part of its opposition to issuance of an injunction in *Crutchfield II* that, *inter alia,* would enjoin the County from allowing THG to construct any part of the 2,200 foot segment of the AC Sewer in the right-of-way acquired by the County for the TC Interceptor. That evidence is not considered in deciding this motion, and THG objected to reliance on it by the Plaintiffs. Thus, that evidence is only considered in deciding the Plaintiffs' motion for an injunction in *Crutchfield II.*

discharge forcemain, the outfall/diffuser and the Lee Davis Pump Station and forcemain. Thus, the cause of the injury complained of will be the Corps' decision to permit those components to be built and the subsequent building and use of those facilities by the County. Even if the Corps acted illegally in issuing THG's permit, that putatively illegal act, albeit contributory of some effluent, will not be the cause of the injury of which the Plaintiffs complain.

### E. The Redressability Component Of The Standing Assessment

■ Several decisions of the Supreme Court illustrate that Article III standing will not lie when redress of a plaintiff's injury depends on speculative contingencies even if the Court grants the requested relief. In *Warth v. Seldin*, 422 U.S. 490, 504, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the Supreme Court considered a challenge to the allegedly discriminatory zoning practices of Penfield, New York. The plaintiffs theory was that the zoning practices unconstitutionally precluded the location of low income housing in the town, and thereby prevented the plaintiffs from living there. The Court found a lack of standing because the plaintiffs failed to show that the requested relief—the striking of the allegedly unconstitutional zoning ordinances—would have benefitted the plaintiffs in a tangible way. Even if the Court had stricken the allegedly offensive ordinances, a number of other factors would have prevented the plaintiffs from being able to live in the town:

> [The plaintiffs'] descriptions of their individual financial situations and housing needs suggest ... that their inability to reside in Penfield is the consequence of the economics of the area housing market, rather than of [the town's] assertedly illegal acts. In short, the facts alleged fail to support an actionable causal relationship between [the town's] zoning

practices and [the plaintiffs'] asserted injury.

*Id.* at 506–07, 95 S.Ct. 2197.

The Supreme Court relied on similar reasoning a year later in *Simon*, 426 U.S. at 43–46, 96 S.Ct. 1917. There, plaintiffs challenged a revenue ruling that allegedly encouraged hospitals to deny services to indigents. The Court, however, found no evidence that the elimination of the revenue ruling would have the opposite effect and result in greater treatment of indigents in hospitals: "Speculative inferences are necessary to connect their injury to the challenged actions of petitioners. Moreover, the complaint suggests no substantial likelihood that victory in this suit would result in respondents' receiving the hospital treatment they desire." *Id.* at 45, 96 S.Ct. 1917. Accordingly, the Court, citing *Warth*, found a lack of Article III standing.

The Court again relied on redressability to deny standing in *Allen*, 468 U.S. at 757–59, 104 S.Ct. 3315, wherein the parents of African–American children challenged the IRS's grant of tax exemptions to some racially discriminatory schools, alleging that this practice diminished their children's ability to receive an education in a racially integrated school. The Court held that this injury was cognizable, but nonetheless found a lack of standing because the line of causation between the IRS's conduct and school desegregation was "attenuated at best," because it depended on a host of contingencies the Court could not address. *Id.* at 757–58, 104 S.Ct. 3315.

■ In light of those Supreme Court decisions, it is clear that the Plaintiffs in this case lack Article III standing because the requested relief will not redress their injury. Even if this Court were to find that the discharge of effluent into the Pamunkey River is a cognizable injury-in-fact fairly traceable to the Corps' decision to

grant an individual permit for THG's project, the requested relief would not redress this injury. Generally, the Plaintiffs ask this Court to set aside the portion of the Corps' permitting decision here respecting the disputed 2,200 feet of the AC Sewer because the Corps failed to characterize this aspect of THG's project as part of the County's revised project and failed to find an associational nexus between THG and the County. The Plaintiffs fail, however, to explain how such a decision would make Corps authorization of the revised project on remand in *Crutchfield II* any less likely, or even whether such a decision would affect the Corps' consideration at all. Nor can the Court discern any reason why setting aside THG's permit would make it either more, or less, likely that, on remand in *Crutchfield II*, the Corps will issue NWPs or an individual permit, or under what conditions either kind of permit would be issued.[11]

The decision in *Crutchfield II* illustrates the insufficiency of the requested relief.

Although, in a very general sense, this Court accepted the plaintiffs' theory of the case in *Crutchfield II*,[12] at no point did the Court actually find that the AC Sewer, or any portion of it, was reasonably related to the County's project or that THG and the County were an association of owners/developers. Nor did the Court make a finding of independent utility or that there was a single and complete project. The responsibility to make those determinations rests solely with the Corps.

The responsibility of the district courts in these cases is to ensure that the agency did not act arbitrarily or capriciously or not in accord with law in reaching its conclusions, not to review de novo the agency's findings. This limited scope of judicial review bears directly on the issue of redressability. This Court's observations in the August 7 Opinion respecting the Bell Creek Project and the AC Sewer have no preclusive effect on the Corps as it reconsiders the County's project. The Corps may very well reach the same con-

**11.** At oral argument, the Plaintiffs for the first time argued the relaxed requirement of the so-called "procedural standing" theory that the Supreme Court described in *Defenders of Wildlife. See* 504 U.S. at 572 n. 7, 112 S.Ct. 2130. While this theory would aid the Plaintiffs if they were challenging procedural defects in the Corps' approval of the WWTP, it is of no avail in a challenge to a distinct permitting decision. As the D.C. Circuit explained in *Florida Audubon Society v. Bentsen*, 94 F.3d 658, 664 (D.C.Cir.1996), "the [procedural rights] plaintiff must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." A "general interest in the alleged procedural violation common to all members of the public" will not suffice. *Id.* Although the D.C. Circuit's observation is cast in terms of injury and not redressability, it nonetheless demonstrates why the redressability requirement is not relaxed here. If the procedural defect will have no impact on whether the Plaintiffs suffer an injury to concrete interests, cure of that defect will not redress the Plaintiffs' particularized

injury. In this case, therefore, since the Plaintiffs have failed to show the THG permit affects the Corps consideration of the WWTP in *Crutchfield II*, they fail to satisfy so-called "procedural rights standing."

**12.** First, the Court found that the Corps did not adequately assess whether the project included all "reasonably related" activities, as required by 33 C.F.R. § 325.1(d)(2). *See Crutchfield II*, 214 F.Supp.2d at 628–37. Accordingly, the Corps' decision that the County's application was "complete" was arbitrary, capricious, and otherwise not in accordance with law. *See id.* at 638. For similar reasons, the Court found that the Corps did not critically assess the scope of the project as required by 33 C.F.R. § 330.6(c) (as amplified by § 330.2(i)) in deciding what wetlands impacts to attribute to the project. *See id.* at 652. Consequently, the Corps' decision as to 33 C.F.R. § 330.6(c) was arbitrary, capricious, and otherwise not in accordance with law. *See id.* at 649–52.

clusions respecting completeness, relatedness, and independent utility that it reached previously, and nonetheless survive judicial review, so long as the decision was neither arbitrary nor capricious nor otherwise not in accord with law. Similarly, were this Court to set aside THG's permit for the reasons the Plaintiffs cite, that decision would not obligate the Corps to reach the conclusion that the Bell Creek Project, the AC Sewer and the WWTP are related projects in deciding whether to authorize the County's project. Nor would setting aside THG's permits dictate that on remand that the Corps is obligated to make, in a particular way, the associational nexus finding that it neglected to make in *Crutchfield II*. The same is true as to the independent utility finding.

More important still, on remand in *Crutchfield II*, the Corps is obligated to follow its regulations concerning relatedness and independent utility (33 C.F.R. §§ 325.1(d)(2), 330.2(i), 330.6(c) and 67 Fed.Reg.2020, 2094) even if this action is dismissed for lack of standing. For example, if the Corps finds that some portion of the Bell Creek Project or the AC Sewer is reasonably related to the County's revised project under § 325.1(d)(2), the Corps is not then free to ignore that component because it was permitted separately under the THG permit. Rather, the County must include that component in its application and the Corps must consider the associated wetlands impacts in making its determination. The same is true of the Corps' independent utility regulations which require an assessment of the associational nexus between THG and the County. And, if the Corps makes the conclusion that the independent utility test is not met in *Crutchfield II*, then the wetlands impact of the AC Sewer will have to be counted in making the permitting decision now before the Corps on remand. Counsel for the Corps confirmed this fact at oral argument. In each instance, the Corps has the duty to apply its regulations honestly, and to explain its conclusions in a logical manner.

In sum, the Corps is obligated to apply all of its regulations in considering the County's revised permit application on remand in *Crutchfield II*, whether or not this Court revokes THG's permit. Stated differently, granting the Plaintiffs the relief they seek will not alter at all foreclosure, the injury of which they complain. Hence, the redressability component of the standing test is not met here.

**F. Motion To Amend Complaint**

At oral argument, the Plaintiffs moved to amend their First Amended Complaint to allege an injury that, they say, is cognizable under *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Under Fed.R.Civ.P. 15(a), amendment at this stage of this case may be permitted only by leave of Court or written consent of the party's adversary. However, leave to amend should be freely granted. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Thus, generally, leave to amend should be granted unless there is a substantial reason to deny the amendment. *See e.g.*, 3 Moore's Federal Practice § 15.14[1]. Further, the general principle requires that parties be allowed to cure defects in jurisdictional allegations. *See e.g.*, 3 Moore's Federal Practice § 15.14[3]. However, it is also quite clear that jurisdiction may not be created by amendment if none exists. *Id.*

 In assessing whether to permit amendment, the Supreme Court has instructed that district courts should consider several factors, including undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing

party, and futility of the amendment. *Foman v. Davis,* 371 U.S. at 182, 83 S.Ct. 227; *Edwards v. City of Goldsboro,* 178 F.3d 231, 242 (4th Cir.1999). Under the rule of *Foman v. Davis,* the Plaintiffs' motion to amend must be denied.

First, the injury that Plaintiffs claim to add by amendment is not of the ilk of the injury that the plaintiffs suffered in *Bennett v. Spear* and thus the amendment would be futile. In *Bennett,* the plaintiffs challenged a Biological Opinion issued by the Fish and Wildlife Service that recommended that the Bureau of Reclamation maintain the water levels in certain reservoirs at minimum levels in order to protect two endangered species of fish. *See id.* at 159–60, 117 S.Ct. 1154. Citing their reliance on that water for irrigation purposes, two neighboring irrigation districts complained that the restrictions the Biological Opinion recommended would injure them by substantially reducing the water available for irrigation. The Supreme Court ultimately found that this injury was sufficient to support Article III standing. The Plaintiffs here, therefore, rely on *Bennett* for the proposition that a plaintiff's injury resulting from an agency action grants that plaintiff standing to challenge decisions by other agencies that affected that decision.

The Plaintiffs' reliance on *Bennett* simply is misplaced. The Court in *Bennett* relied heavily on the fact that Biological Opinions of the sort the Fish and Wildlife Service issued there have a "virtually determinative effect" on agency action. *Id.* at 169, 117 S.Ct. 1154. The Plaintiffs have not shown that the Corps' decision to authorize the AC Sewer portion of THG's project has any such determinative effect on the Corps' decision respecting the County's revised project—*i.e.,* the direct cause of the plaintiffs' injury.

Second, the Plaintiffs have had an opportunity to amend the complaint after having been told at the Initial Pretrial Conference that there was a concern about their standing. The amendment that Plaintiffs thought sufficient to cure that defect was reflected in the First Amended Complaint. For the reasons set forth above, the amendment did not do so. Another opportunity is not warranted.

Third, there is substantial prejudice to THG if an amendment is permitted at this late date. The parties were put on an expedited schedule to address the standing issue because THG's Bell Creek Project is significantly advanced in the construction stage and is awaiting construction financing in the form of an issue of bonds, and because tenants and homeowners are expecting to occupy premises at the project beginning in December. Under the circumstances, to allow this amendment, even if it were not futile and even if the Plaintiffs had not been afforded a previous opportunity to amend, would be prejudicial to THG.

For the foregoing reasons, the oral motion to amend the First Amended Complaint to add an injury that is governed by the rule of *Bennett v. Spear* is denied.

## CONCLUSION

For the foregoing reasons, THG's Motion to Dismiss this action for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) is granted. The dismissal is without prejudice. THG's Motion for Summary Judgment under Fed.R.Civ.P. 56 on the ground that the Plaintiffs are in laches is denied as moot.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.